**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 93-1109-MORENO

UNITED STATES OF AMERICA,
Plaintiff,                                          CIV-93-1109-MORENO

v.

METROPOLITAN DADE COUNTY,
MIAMI-DADE WATER AND SEWER
AUTHORITY DEPARTMENT, and the
STATE OF FLORIDA,

Defendants.

_____

BISCAYNE BAY WATERKEEPER,
465 Ocean Drive, #417 Miami Beach, Florida
33149, and JUDI KOSLEN,
a Key Biscayne, Florida Resident

Proposed Plaintiffs-Intervenors

_____/

**COMPLAINT IN INTERVENTION**
**(Statutory Intervention Pursuant to 33 U.S.C. Sec. 1365(b)(1)(B))**

**COMMON ALLEGATIONS**

**Preliminary Statement**

1.      As this Court is aware, Miami Dade County, through its Water and Sewer

Department, was ordered by two consent decrees entered by this Court in 1994 and 1995 to

operate the County's sewage collection and transmission system in a manner that avoids

discharges of untreated, raw sewage into public waters.   Regrettably, since entry of the consent

decrees, precious little has been done to achieve full compliance with the requirements of the

consent decrees and the Federal Clean Water Act.  It is a sad fact that repeated, regular and reoccurring discharges of raw sewage have occurred defiling the waters of the United States including the Miami River, Biscayne Bay and the near shore Atlantic Ocean, all in clear violation of the Act and the consent decrees.  The County has failed to take, as ordered by this Court, all steps necessary to avoid unpermitted discharges of sewage.  This Complaint in intervention seeks an order from this Court declaring the County to be in violation of the existing consent decrees and preventing the County from entering into yet another inadequate consent decree as a purported remedy for past violations under circumstances where the currently proposed new consent decree appears facially ineffective, unfair and unreasonable.

2.     This is a Complaint in intervention as a matter of right, brought under Section 505 of the Federal Water Pollution Prevention and Control Act (hereinafter referred to as the "Clean Water Act" or the "Act"), 33 U.S.C. § 1365(b)(1)(B), by the Biscayne Bay Waterkeeper, a Florida not-for-profit organization, and Judi Koslen, a Key Biscayne resident.

3.     The initial Complaint in this case was filed on June 10, 1993.  Miami-Dade County's sewage collection, transmission and treatment system, which is the subject matter of the case, is currently managed by Miami-Dade County, its Mayor, and Board of County Commissioners (the "County") and the County's Water and Sewer Department ("WASD").  The County, operating by and through its elected officials and WASD, is the governmental body responsible for ownership and operation of the sewage collection and transmission system within the County.

4.     For at least the past five-years and continuing to the present day, the County has discharged raw, untreated sewage into the waters of the United States and the State of Florida, including Biscayne Bay, the Intracoastal Waterway, the Atlantic Ocean, and other surface

waters, as well as onto public and private property (*e.g.*, public streets, yards, parking lots, etc.) from over two-hundred and sixty (260) sewage overflows. (*See* "Miami-Dade SSOs from 24-hour emails," attached hereto as exhibit 1.).

5.      Sewage is meant to be collected and transported into publicly-owned treatment works ("POTW") for sanitary transmission and disposal.  The unintentional and unpermitted discharge of raw sewage is referred to as a Sanitary Sewer Overflow ("SSO").  SSOs are typically caused by breaks, blockages or system overloads.  SSOs can also result from deteriorating sewer systems worsened by improper installations, operation and maintenance.

6.      The United States Environmental Protection Agency ("EPA") has acknowledged that SSOs cause contamination and can lead to serious water quality problems.  *See* EPA Guidance Document, "Sanitary Sewer Overflows and Peak Flows," at http://cfpub.epa.gov/npdes/home.cfm?program_id=4.  Because SSOs contain raw sewage they can carry bacteria, viruses, protozoa (parasitic organisms), helminthes (intestinal worms), and inhaled molds and fungi.  The diseases SSOs may cause range in severity from mild gastroenteritis (causing stomach cramps and diarrhea) to life-threatening ailments such as cholera, dysentery, infections hepatitis, and severe gastroenteritis.  Pollutants present in SSOs include microbial pathogens, suspended solids, toxics, nutrients, floatables, and trash. Unsurprisingly, SSO discharges are illegal.

7.      The present case was initiated by the United States against the County after numerous serious SSO incidents.  For example, in 1987 a force main rupture spewed ten million gallons of untreated wastewater into the Miami River.  RiverFest had to be cancelled.  According to the EPA, years of underfunded maintenance resulted in over 2,200 raw waste spills into streets

and waterways in the County between 1985 and 1994, posing a serious threat to both public health and the environment.

8.     The United States' Complaint against the County culminated in a partial Consent Decree dated January 13, 1994 and entered by this Court on January 18, 1994 (DE 36), and the Second and Final Partial Consent Decree dated April 17, 1995 and entered by this Court on September 12, 1995 (DE 118).  The consent decrees focused on achieving system upgrades and improvements to repair deterioration of the system so as to avoid future SSOs.

9.     Notwithstanding the consent decrees and system upgrades undertaken as a result, the County's sewer system remains in an unacceptable and dangerous condition resulting in repeated unpermitted SSOs in violations of the consent decrees, as well as 33 U.S.C. §§ 1311 & 1342 *inter alia*, and the County's National Pollutant Discharge Elimination System ("NPDES") permits at its North and Central Wastewater Treatment Plants, as set forth more fully below.

10.     For instance, in October 2011, malfunctions at a wastewater plant spilled millions of gallons of partially-treated sewage into coastal waters resulting in no-swimming advisories along miles of County beaches.  A generator failure caused one of at least 65 ruptures that spewed more than forty-seven million gallons of untreated human sewage into Miami-Dade County waterways and streets from 2009-2011.  *See* Rabin, Charles and Morgan, Curtis, "Miami-Dade's leaky pipes: More than 47 million gallons of waste spilled in past two years," *The Miami Herald*, May 14, 2012, http://www.miamiherald.com/2012/05/14/2799249/ miami-dades-leaky-pipes-more-than.html (hereinafter, "Rabin & Morgan, *Miami-Dade's Leaky Pipes*").

11.     In paragraph 8 of both of consent decrees in this case, the County agreed to "take all steps necessary to minimize further unpermitted discharges of untreated wastewater containing raw sewage to local surface waters."  Since entry of the consent decrees, and

4

notwithstanding purported EPA oversight, the County has failed to comply with this obligation under the two consent decrees, which are lawful orders of this Court.  The County has not taken "all steps" necessary as is evidenced by repeated and continued SSOs.

12.     Rather than invest in repairs to the system that would avoid further unpermitted discharges, the County's sewage collection and transmission system has fallen into such a state of disrepair that the Director of WASD recently publicly stated that the sewage collection and transmission system is being held together with "chewing gum." *See* Rabin & Morgan, *Miami-Dade's Leaky Pipes* ("John Renfrow, director of Miami-Dade's Water and Sewer Department, acknowledged the string of major ruptures that have plagued the county's sewage system in recent years, saying the aging network is 'being held together by chewing gum.' He added he has sought more money to fix the leaks for a long time.").

13.     The Court ordered the County to adopt "all steps" necessary to minimize future discharges.  This requirement is not being met by operating a system "held together by chewing gum." The County's failure to address the system's shortcomings violates the 1994 and 1995 federal Consent Decrees and has resulted in further unpermitted discharges in violation of both Consent Decrees and the NPDES permits for WASD's North and Central plants.

14.     Faced with repeated and clear violations of the Consent Decrees and the CWA, and as an apparent preemptive strike against a Clean Water Act citizens' suit, the County and EPA are considering a new and revised consent decree.  A copy of a publicly available draft of the new and revised Consent Decree is attached hereto as Ex. 2.   The Capital Projects list committed to in the new, revised Consent Decree is attached hereto as Ex. 3, as published by WASD on its own website, which is found at http://www.miamidade.gov/water/library/reports/wastewater-improvement-projects-list.pdf.    As

set forth below, the proposed new consent decree will not result in improvements to the system that will effectively end future unpermitted discharges.

15.    The County failed to comply with the 1994-95 Consent Decrees and drove its sewer system into a condition of severe deterioration and violation of State and Federal Clean Water laws by intentionally starving the system of needed operation and maintenance funds and by using those WASD funds to achieve other County objectives.

16.    Meanwhile, the proposed revised consent decree, which Plaintiff/Intervenors believe will shortly be submitted to this Court for approval, is not fair, reasonable or in the public interest.  The proposed consent decree is unfair, unreasonable and contrary to the public interest because it:

    a.   does not end current operation and maintenance ("O&M") violations at the Central Plant on Virginia Key;

    b.   fails to require the immediate abatement of the imminent and substantial endangerment caused by improper operation and maintenance of the 54" under-bay force main from Miami Beach to the Central Plant on Virginia Key and to provide real-time/real-world emergency response and cleanup capability in case of a Miami Beach pipeline rupture;

    c.   fails to plan an end to sewage ocean outfalls from the North and Central Plants (which currently pump approximately 300 million gallons of sewage *per day* into near shore Atlantic Ocean waters) or otherwise provide for State laws that require phase out of the ocean outfalls and a reuse feasibility study that meets state objectives to promote reuse of reclaimed water, *see* Fla. Stat. §§ 403.086 & 403.064;

     d.   fails to take into consideration, in any fashion, climate change, sea level rise, storm surge and other impacts, particularly as it relates to the Central Plant on Virginia Key;

     e.   fails to guarantee funding for the needed capital improvements and for future O&M expenses;

     f.   fails to adequately plan for the projected capacity needs in the system;

     g.   fails to provide real-time and real-world emergency response capacity to respond to leaks in under-bay sewer lines;

     h.   does not require implementation of capital projects on a suitably tight time-schedule with no loopholes; and

     i.   does not require outside supervision through a "special master" or "inspector general," reporting regularly to the Court and the public.

17.    Without a concrete and specific consent decree, and heightened judicial oversight, the situation in the future, particularly in a time of budgetary constraints, will simply be a repeat of the past seventeen-years, where, notwithstanding two consent decrees and promises to "take all steps necessary to minimize further unpermitted discharges of untreated wastewater containing raw sewage," the County does not invest in its sewage collection and transmission system in order to avoid future violations of Federal and State law and protect the public from the substantial risks created by its decrepit, underfunded and inadequate sewage system.

## Jurisdiction

18.    This Court has subject matter jurisdiction over this complaint under 28 U.S.C. § 1331, and Section 505(a)(1) of the Clean Water Act, 33. U.S.C. §1365(b)(1)(B) without regard to the amount in controversy or the citizenship of the parties.  Under Section 505 of the Clean

Water Act, 33 U.S.C. §1365(b)(1)(B), citizens are granted a statutory right to intervene in actions brought by the EPA against violators to enforce the terms of the Act. Recognizing that the resources of the federal and state environmental agencies would not permit those agencies to fully enforce the Act in every instance of a violation, Congress authorized citizen suits as "an integral part of the overall enforcement scheme of the Act."

19.     By letter of October 8, 2012, the Plaintiff/Intervenors gave notice to the County of violations of the Act and of the Plaintiff/Intervenors' intention to bring a separate citizens' suit for violations. (*See* Exhibit 3.) The Notice Letter informed the County of its violations of the Clean Water Act and of Waterkeeper and Ms. Koslen's intention to file suit. The notice was also delivered to the EPA, FDEP, and to all other parties required under the Act and regulations. The notice meets the requirements of Section 505 (b)(1)(A) and the applicable regulations implementing the Act, 40 C.F.R. §§ 135.2 & 135.3.

20.     Based upon public documents including statements of Director of WASD, the County and the EPA intend to enter into a new and revised consent decree to supersede the two Consent Decrees that have previously been entered in this case.

21.     Although at the end of the 60-day Notice Period, Plaintiff/Intervenors intend to file a citizen suit under 33 U.S.C. § 1365(a) for violations of the Act, this Complaint in intervention challenges The County' ongoing violations of the consent decrees. Waterkeeper and Ms. Koslen are filing this Complaint now to protect their and Waterkeeper's members' interests in ensuring that the existing consent decrees are honored, and that any new or revised consent decree is fair, adequate, reasonable and in the public interest.

**<u>Description of the Parties</u>**

22.     Pursuant to Miami-Dade County Home Rule Charter Article 5 § 5.09.A, control of the sewer system of Miami-Dade County is vested in the Mayor and the Commissioners.  The Miami-Dade Water and Sewer Department ("WASD") is the entity through which Miami-Dade County manages its sewer collection and transmission system, including pumping stations, force mains, ocean outfalls, etc.

23.     The Miami-Dade Water and Sewer Department is vested with the power to sue and be sued, and is a "person" and a "governmental instrumentality or agency" under the Clean Water Act.  33 U.S.C. § 1365(a)(1).

24.     Plaintiff-Intervenor, Biscayne Bay Waterkeeper ("Waterkeeper"), is a non-profit corporation, organized and existing under the laws of the State of Florida, with its principal place of business in Miami Beach, Florida.  Waterkeeper's mission is to protect and enhance the water quality of Biscayne Bay and its tributaries for the benefit of its ecosystems and the surrounding human communities. Waterkeeper accomplishes its mission through education, advocacy, restoration and enforcement of environmental laws.

25.     Waterkeeper membership includes individuals who use the waters of the United States within Miami-Dade County, including Biscayne Bay and the Intracoastal Waterway and other surface waters and their beaches for recreational purposes such as boating, swimming, and fishing. Local members also live, work, recreate, or all, in the vicinity of Biscayne Bay and the Intracoastal Waterway and other surface waters in Miami-Dade County and have a conservation and aesthetic interest in ensuring that these water bodies and their banks are not fouled by raw sewage overflows.

26.     Because Waterkeeper members swim, boat, fish and recreate in Biscayne Bay, the Intracoastal Waterway and other surface waters in Miami-Dade County, Waterkeeper members are regularly in contact with the surface waters and, thereby, adversely affected by presence of raw sewage overflows and SSOs. The County's raw sewage overflows, therefore, present a threat to Waterkeeper members' health and well-being, if they come in contact with sewage-contaminated waters. Furthermore, water contaminated by the County's illegal sewer overflows is offensive to Waterkeeper members' aesthetic and recreational interests in boating in waters that have not be contaminated by the County' illegal sewer overflows.

27.     Waterkeeper is informed and believes that the County's failure to adhere to the consent decrees, continued illegal SSO discharges, and violations of its NPDES permits degrades water quality and harms aquatic life in the local waters of Miami-Dade County used and enjoyed by Waterkeeper members, and, thus, impairs Waterkeeper's members' use and enjoyment of these waters.

28.     The interests of Waterkeeper's members have been, are being, and will continue to be adversely affected by the County's failure to comply with the consent decrees and the Clean Water Act. The relief sough herein will redress the harms to Waterkeeper and its members caused by the County's actions and inaction. The County's continuing violations of the consent decrees and the Clean Water Act will irreparably harm Waterkeeper and its members, for which harm they have no plain, speedy, or adequate remedy at law.

29.     Plaintiff-Intervenor, Judi Koslen, is a resident of Key Biscayne.  Ms. Koslen is a breast-cancer survivor, who is frequently on the waters of Biscayne Bay.  She regularly paddles on the Bay, (including in the Virginia Key marine stadium boat basin), the Intracoastal Waterway and other surface waters in the County.  In such recreational activities, Ms. Koslen is

regularly in contact with the surface waters. Ms. Koslen is regularly splashed by the surface waters in her face and nose and mouth and is, as a consequence, directly affected by presence of raw sewage SSOs.

30.     Ms. Koslen must wade in the waters if she takes her boat onto a beach or shoreline.  She recently suffered an infection on her leg after contact with the water in removing the boat from the water.  Since then, she has avoided direct contact with the water to the extent possible. The County's raw sewage overflows, therefore, present a direct threat to Ms. Koslen's health and well-being, if she comes in contact with sewage-contaminated waters. Furthermore, water contaminated by the County's illegal sewer overflows is offensive to Ms. Koslen's aesthetic and recreational interests in boating in waters that have not be contaminated by the County' illegal sewer overflows. The quality of the waters in Miami-Dade County directly affects Ms. Koslen's recreational, aesthetic, and/or environmental interests.

31.     Ms. Koslen's interests described above have been, are being and will continue to be adversely affected by the County's failure to comply with the consent decrees and the Clean Water Act. The relief sought herein will redress harm to Ms. Koslen's interests. The County's continuing violations of the consent decrees and the Clean Water Act will irreparably harm Ms. Koslen's interests, for which harm she has no plain, speedy, or adequate remedy at law.

## Regulatory Framework

32.     The objective of the Clean Water Act 33 U.S.C. §§ 1251, et seq. "is to restore and maintain the chemical, physical and biological integrity of the Nation's waters." *See* 33 U.S.C. § 1251(a).  To that end, Section 301(a) of the Act declares unlawful "the discharge of any pollutant by any person" not in compliance with other specified sections of the Act. 33 U.S.C. §1311(a), 1342(b).

33.     In furtherance of this objective, the Act prohibits the discharge of pollutants into the waters of the United States, except as authorized by permit.  Before discharging any pollutants into waters of the United States, facilities must obtain a National Pollutant Discharge Elimination System permit ("NPDES"), specifically authorizing and limiting the discharge of each particular pollutant.  33 U.S.C. §1342.

34.     Section 402(a) of the CWA, 33 U.S.C. § 1342(a) provides that the permit issuing authority may issue an NPDES permit that authorizes the discharge of any pollutant directly into navigable waters of the United States, but only in compliance with the applicable requirements of CWA § 301, 33 U.S.C. § 1311, and such other conditions as the authority determines are necessary to carry out the provisions of the CWA.

35.     Section 309(d) of the CWA, 33 U.S.C. § 1319(d), provides that any person who violates Section 301 of the CWA or violates any permit condition or limitation in an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, shall be subject to a civil penalty. Pursuant to the Federal Civil Penalties Inflation Adjustment Act as amended by the Debt Collection Improvement Act, the maximum civil penalty for violations occurring between March 15, 2004 and January 12, 2009 is $32,500 per violation per day, and the maximum civil penalty for violations occurring on or after January 12, 2009 is $37,500 per violation per day. 28 U.S.C. § 2461, 31 U.S.C. § 301 note; 40 C.F.R. §§ 19.1-19.4.

36.     In addition, POTWs must provide at least secondary treatment, as defined by EPA and its regulations, for all sewage in the sewer system before discharge.  *See* 33 U.S.C. § 301(b)(1)(B).

37.     Unpermitted Sanitary Sewer Overflows, being the discharge of raw, untreated sewage from the sewage conveyance system before treatment occurs, constitute violations of the

Act. *See* 33 U.S.C. § 1311(a); *see also Foti v. City of Jamestown Bd. of Public Utilities*, Case No. 10-CV-5750-RJA, 2011 WL 4915743, at *15 (W.D.N.Y. Aug. 15, 2011).

38.     Each SSO in Miami-Dade County is a separate, un-permitted point source discharge.

39.     The County operates three wastewater treatment plants: The North Plant, the Central Plant and the South Plant. The North Plant operates pursuant to NPDES FL0032182. The Central Plant operates pursuant to NPDES permit FL0024805. The South Plant operates pursuant to a Florida DEP Underground Injection Control Permit and FDEP FL042137.

## History and Background

40.     The history of sewage pollution problems in Miami-Dade County is well-documented. The first part of that history can be found in *City of North Miami v. Train*, 377 F. Supp. 1264 (S.D. Fla. 1974) (Mehrtens, J).

41.     As found in *City of North Miami*, sewage pollution of Miami's rivers, bays and beaches had become so chronic by the early 1970s that it was the subject of a major report by the United States Department of the Interior. "The final Federal Report concluded that (1) the 1,000 miles of canals of Dade County were grossly polluted and in violation of the County and state water quality standards …; (4) present methods for disposal through ocean outfalls without adequate treatment required modification because of public health hazards and detrimental effects of water quality; and (5) the major cause of poor water quality in Dade County was inadequately treated municipal sewage effluent." *Id.* at 1264.

42.     The result of the *City of North Miami* case was, among other things, the eventual operation by the County of three regional sewage transmission plants, the North, South and Central Plants.

43.     On May 11, 1992, a Miami Grand Jury issued a report on the condition of the Miami-Dade sewer system and the County's role in it. *See* "In Circuit Court of the 11th Judicial Circuit of Florida in and for the County of Dade, Fall Term, A.D. 1991, Final Report of Grand Jury" (Greenbaum, J.).

44.     Notwithstanding that the County-caused sewage pollution in the 1970s was supposedly addressed by the construction of three new wastewater treatment plants, the Grand Jury reported in 1992 that "Dade's antiquated and inadequate sanitary sewer system today accounts for over one-half of the pollution presently in the Miami River." *Id.* at 10.

45.     According to the Grand Jury: "During the 1980s, WASA [n/k/a WASD] discovered that  a significant portion of the sewer pipes had deteriorated, requiring remedial work, such as the replacement and relining of existing pipes. Unfortunately, the pipes under the Miami River were not addressed before one failed. In 1987, the sewer line under the Miami River collapsed resulting in six million gallons of raw sewage spewing forth. This spill necessitated an extended closure of the Miami River and portions of Biscayne Bay to the public for any use whatsoever." *Id.* at 11.

46.     In 1992, the Grand Jury further concluded: "Today, if there was a catastrophic failure at any of the regional processing facilities, the entire flow directed at that facility could not be redirected to other plants. The result will be another multi-million gallon spill of raw sewage into the most likely location, the Miami River." *Id.* at 12.

47.     With regard to the Cross Bay Sewer Line, the Grand Jury concluded: "all of the above contaminators pale in comparison to potentially the most serious environmental catastrophe waiting to happen under Biscayne Bay…The time bomb laying under the bay is the sewer line that pumps Central Dade County's raw sewage to Virginia Key for processing…

Based on statistical probability, it is only a matter of time until the cross bay sewer pipe collapses…In 1985/86, WASA determined that the cross bay pipe needed replacement.  After seven years, nothing has been completed other than studying the problem… If this sewer line experiences a complete failure, hundreds of millions of gallons of raw sewage will pour into Biscayne Bay… In the meantime, the Miami River and Biscayne Bay would experience their worst environmental catastrophe in modern history." *Id.* at 15-16.

48.      In 1993, seeking to stop the illegal discharge of raw sewage into Miami-Dade's streets and waterways and to expedite the replacement of a decaying cross bay pipeline that carried wastewater to the plant on Virginia Key, the United States filed its complaint in the present case against the County.

49.      A partial consent decree was entered by this Court in January 1994, partially resolving the United States' claims against the County. (DE 36.)  A second and final decree was entered by this Court on September 12, 1995. (DE 118.)

50.      Broadly stated, the first consent decree focused on the imminent and substantial endangerment posed by the cross bay sewage force main while the second consent decree focused on the sewage collection and transmission system as a whole.

51.      Both decrees contained similar "general duty" language in paragraph 8. Specifically, the County specifically agreed to "take all steps necessary to minimize further unpermitted discharges of untreated wastewater containing raw sewage to local surface waters." The County also agreed to "cause the immediate implementation of the remedial measures as herein set forth, take all steps necessary to minimize further unpermitted discharges of untreated wastewater containing raw sewage to local surface waters, and agree to all other conditions of this Consent Decree."

52.     The two consent decrees are presently operative. The obligations of those decrees have been a continuing, lawful order of this Court since the day that each one was entered.

53.     In 1995 the then director of WASD, Anthony Clemente admitted that 1995 Consent Decree was meant to end one sewer crisis, but that "the program to assure the crisis [didn't] happen again and to honor commitments made to the state and federal government [would] take several years to complete.  *See* Miami New Times, Semple, Kirk, "The Million Dollar Flush", Jan. 26, 1995,  http://www.miaminewtimes.com/1995-01-26/news/the-million-dollar-flush/2/. ("The US Attorney's Office produced a 66-page list of sewage overflows … [that] detailed more than 2200 incidences dating from August 1981 to October 1994."  The entities involved in the 1995 Consent Decree didn't take steps to "assure the crisis [wouldn't] happen again." *Id.*

54.     Notwithstanding that the County has operated under two federal court consent decrees for over past seventeen years, and promised the EPA and the Court not once, but twice that it would "take all steps necessary" to make sure that the situation in the late 1980s and early 1990's would not occur again, in fact, the County, through a pattern of neglect, mismanagement and inattention, has allowed repeated discharges to occur in violation of the Clean Water Act and the consent decrees.

55.     Over the past two-years alone, SSOs from the Miami-Dade sewer system discharged 47-million gallons of raw sewage, much of which ended up polluting Miami waterways. *See* Rabin and Morgan, *Miami-Dade's Leaky Pipes*.  A single sewage spill in 2010, for example, resulted in the discharge of twenty (20) million gallons of raw sewage into the Biscayne Canal, a navigable water of the U.S.  *See* Miami-Dade County Water & Sewer Infrastructure Report from July 2012, at 25, attached as exhibit 6.

56.     SSOs have high concentrations of bacteria from fecal contamination, pathogens and nutrients, all of which are significant contributors to the impairment of rivers, surface waters and bays. Aside from the pollutant impact on surface waters, sanitary sewer overflows frequently occur in areas that may be frequented by pedestrian traffic and pets, providing a likelihood of direct contact with pathogenic bacteria and viruses in the wastewater, and posing a significant public health risk to area residents.

57.     In WASD's July 2012 Infrastructure Report (ex. 6), WASD acknowledged that unmet critical infrastructure needs for the sewer system totaled $736 million, and this was just the "most deteriorated and vulnerable" parts of the system.  By the Fall of 2012, this number had increased to $1.4 billion, with the County claiming that repairing the entire water and sewer system may cost $10-12 billion. *See* Wastewater Improvement Project List, attached hereto as ex. 4.   *See, e.g.,* Miami Herald, Rabin, Charles, "New long-term bill for Miami-Dade water and sewer repairs could top $12 billion", September 17, 2012, http://www.miamiherald.com/2012/09/17/3007247/new-long-term-bill-for-miami-dade.html.

58.     On Friday, October 12, 2012, at a meeting with the Miami-Dade development community, WASD Deputy Director, Douglas Yoder, explained that the County charged the lowest rates in the country for water and sewer services.  According to Mr. Yoder, WASD charges only 1/3 of what it actually costs to provide water/sewer services to homes and business. The shortfall – a byproduct of the lack of political will to properly fund the system – has contributed to a sewage collection and transmission system that is ineffective in violation of the consent decrees and causing Clean Water Act violations.

59.     Where the County is obliged under the consent decrees, to take "all steps" to minimize future unpermitted discharges, the County's failure to provide adequate financing to

efficiently and effectively operate its sewage collection, transmission and treatment system is a violation of the decrees.   In short, the County's underfunding of the system has denied the system proper operation and maintenance, thereby directly causing hundreds of separate violations of federal and state law.

60.    During this same period of underfunding, the County actually took tens of millions of dollars out of WASD to balance the County's general budget, thereby exacerbating the problems in the system and causing more violations of federal and state law. WASD's own Comprehensive Annual Financial Report for the Fiscal Year Ended September 30, 2011 shows transfers from WASD to the County's general fund of $32,220,000 in 2011, $22,868,000 in 2006, $27,701,000 in 2005, $37,899,000 in 2004, $39,996,000 in 2003 and $33,035,000 in 2002. Miami-Dade Water and Sewer Department, Comprehensive Annual Financial Report for the Fiscal Year Ended September 30, 2011, http://www.miamidade.gov/water/library/reports/annual-financial-2011.pdf, at 74.

61.    The County has failed to comply with the lawful decrees of this Court in that it has not taken all steps necessary to minimize unpermitted discharges of raw sewage from SSOs and to prevent permit violations at its wastewater treatment plants. If it had, then the SSOs and NPDES violations, as described herein, would not have occurred and would not be occurring now.

62.    Plaintiff/Intervenors' 60-day Notice Letter documents the County's repeated SSO and NPDES violations. (*See* Ex. 3.)   Furthermore, in addition to the specifically enumerated violations set forth in the attached Notice Letter, the County has actual knowledge of the precise location and date of each SSO that has discharged into the receiving waters of Miami-Dade County, as well as those SSOs that have discharged on to public and private property (e.g.,

streets, yards, parking lots, etc.). Each such SSO event is specifically incorporated herein as an additional and separate violation.

63.     Of the hundreds of SSOs from Miami-Dade's sewage collection and transmission system, WASD has reported that many overflows have discharged to surface waters and into the municipal storm-water system, also owned and operated by the County. On information and belief, SSOs that enter the storm-water system has also discharged raw sewage to the navigable waters of the US.

64.     On information and belief, the County has not assessed the full and complete public health and environmental impact of its SSO overflows, including sludge and sediment deposition, pathogens, viruses and toxic pollutant effects in the areas downstream from the SSOs.

65.     The County's Central Plant is presently in a condition of continuing "Significant Out of Compliance" with its permit. Those violations are set forth in the Plaintiff/Intervenors' 60-day Notice Letter and specifically incorporated, herein.

66.     The violations at the Central Plant include these specifically-identified violations: (1) failure to properly operate and maintain the plant and appurtenant facilities (40 C.F.R. Sec. 122.41(e); (2) failure to provide sufficient funding for equipment, maintenance and personnel, all of which are part and parcel of proper operation and maintenance of the plant; (3) failure to obey NPDES effluent limitations for the plant on the specific dates set forth in the June 12, 2012 EPA Inspection Report (and other EPA and State reports) and all other instances of effluent violations reported by the County to EPA and the State (which are within the County's actual knowledge); (4) violation of EPA Pre-Treatment regulations; (5) failure to have critical equipment on-line at all times; (6) failure to maintain critical equipment at all times; (7) failure to even install new

equipment brought on site due to lack of adequate funding for personnel; and, (8) failure to properly operate and maintain the plant, thereby resulting in foul and noxious odors repeatedly emanating from the plant onto public and private property.

67.    Recent violations at the Central Plant are catalogued in the EPA's Compliance Evaluation Inspection Report, dated June 12, 2012 (hereinafter, "EPA Inspection Report"), a copy of which is attached as exhibit 5.

68.    The Central Plant's Federal NPDES Permit has lapsed and has never been officially renewed, because it is allegedly pending EPA review. The State re-issued its Permit for the Central Plant on October 17, 2012, after the Plaintiff/Intervenors' 60-day Notice Letter was filed.

69.    The new Central Plant State permit concedes that the State does not have sufficient information as to the adverse impacts of the County's ocean outfalls on the marine environment. *See* "Order Establishing Compliance Schedule Under Section 403.088(2)(f), F.S.", Para. 8, p. 2: "At the time of permit issuance, there is limited available data on the affects of the discharge to the ocean and the water quality of surrounding open ocean and coastal environment. Additional studies are needed and are included as part of the new wastewater permit."

70.    On information and belief, neither the State nor the EPA has in its possession sufficient information to determine the adverse impacts of the Central Plant and North Plant's ocean outfalls on the marine environment.

71.    The imminent and substantial endangerment condition of the under-bay sewage force main from Miami Beach to Virginia Key violates the proper operation and maintenance of appurtenant structures in the NPDES Permit for the Central Plant, 40 C.F.R. Sec. 122.41(e), and Para. 8 of both the First Partial Consent Decree and Second and Final Partial Consent Decree in

CIV-93-1109. *See also* Miami Today, Ortiz, L., "Sewage Leak 'Time Bomb' in Biscayne Bay", week of July 26, 2012, http://miamitodaynews.com/news/120726/story2.shtml ("'***The pipe is about to burst***,' John W. Renfrow…told the county commission last week. '***We're facing a catastrophic event***' … 'we can't afford any delay.'") (emphasis added).

72.      Indeed, during the EPA inspection documented in the EPA Inspection Report, WASD officials acknowledged that "the 54" force main from Miami Beach … was in very bad shape." (Ex. 4, Compliance Evaluation Inspection Report at 1.)

73.      In 1992, the Grand Jury warned about an under-bay sewer force main being a "ticking time bomb" that could cause an environmental catastrophe. That "time-bomb" of an cross-bay force main in 1992 was the subject of the First Partial Consent Decree in 1994.  Now, in 2012, there is yet ***another*** under-bay "time-bomb" that is about to burst. This time, it is the 54" under-bay, sewer force main from Miami Beach to the Central Treatment Plant on Virginia Key.

74.      This is not mere coincidence. The current "ticking time bomb" is a direct and proximate result of the County's intentional acts and omissions, in which County officials failed to provide the WASD with sufficient funds to properly operate and maintain its sewage collection and treatment system, including the under-bay, sewer force main from Miami Beach to Virginia Key.

75.      Under appropriate engineering practices, no part of a properly operated system should reach to the point where a force main carrying millions of gallons of sewage a day (especially one under ecologically-significant, Biscayne Bay) is "suddenly" about to explode. Once those in charge are aware of a situation with such a huge potential harm, actions must be

taken promptly to reduce the risk of catastrophe, including having appropriate emergency response measures in place – actions that the County has failed to take to date.

76.     Like the situation in 1987 (Miami River) and 1994 (Miami under-bay pipeline to Virginia Key), the County still does not have the plans, nor the real-time, emergency response capability to immediately stop the catastrophic pollution of the Bay, if this under-bay pipe (Miami Beach to Virginia Key) were to suddenly collapse.

77.     Biscayne Bay is an ecologically sensitive water-body and a defining feature of South Florida. Biscayne Bay is an important and heavily-used resource, with special aesthetic and recreational significance for people living in Miami-Dade County, as well as the surrounding communities and millions of tourists. Biscayne Bay includes Biscayne National Park (http://www.nps.gov/bisc/index.htm) within its boundaries, the Biscayne Bay Aquatic Preserve (http://www.dep.state.fl.us/coastal/sites/biscayne/), coral reefs, and numerous, highly-valued lagoons, beaches and points of public access that offer unique recreational opportunities for anglers, swimmers, snorkelers, divers, kayakers, windsurfers, and other recreational users.

78.     The County's violations of the consent decrees, SSOs and NPDES violations pose a serious risk of harm to human health and to the ecological health of Biscayne Bay.

79.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $32,500 per day of violation occurring from March 15, 2004 through January 12, 2009, and $37,500 per day per violation for violations occurring after January 12, 2009. 33 U.S.C. Sec. 1319(d); 40 C.F.R. Sec. 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

80.     Just the 260 County-admitted SSO violations would amount to almost $10 million in civil penalty liability to the taxpayers of Miami-Dade County due to neglect of the system and, this is does not include the' NPDES violations at the North Plant and the Central Plant.

81.     The gravity of these offenses is significant, given that they were the direct consequence of intentional and knowing underfunding and mismanagement. The civil penalties agreed to by the EPA in the proposed new consent decree are wholly inadequate to properly deter Miami-Dade County from engaging in this illegal behavior again.

82.     Substantial civil penalties promote environmental compliance and help protect the public health by deterring future violations by the same polluter and deterring violations by other members of the regulated community.

83.     Substantial civil penalties help ensure a level national playing field by ensuring that polluters do not obtain an unfair economic advantage over competitors who have done whatever was necessary to comply on time.

84.     The County's failure to adhere to the consent decrees, and the SSO and NPDES violations from its sewage collection and treatment system to waters of the United States, are ongoing and continuous.

85.     Each SSO overflow, whether to the navigable waters of the US or not, is a violation of the County' NPDES permits and, each one is a separate and distinct violation of Section 301(a) of the Act.

86.     Waterkeeper is informed and believes, and thereupon alleges, that significantly more SSOs than have been reported by the County will be discovered, and significantly more NPDES violations than reported by the County will be discovered through this enforcement action. Each additional SSO violation and each additional NPDES violation constitutes a separate Clean Water Act violation.

**CLAIM FOR VIOLATION OF CLEAN WATER ACT AND CONSENT DECREES**

87.     The common allegations are incorporated herein by reference.

88.     Through the acts and omissions described herein, the County has violated and will continue to violate the Clean Water Act, 33 U.S.C. § 1311 and 1342, *inter alia*, and regulations promulgated thereunder.

89.     Through the acts and omissions described herein, the County has violated and will continue to violate the two Consent Decrees filed in the case.

90.     Pursuant to 33 U.S.C. § 1365 and by reason of the foregoing acts and omissions of the County, the Plaintiff/Intervenors are entitled to an order enforcing the law and imposing civil penalties against the County.

91.     Pursuant to 33 U.S.C. §1365, the Plaintiff/Intervenors are entitled to recover their costs of litigation, including reasonable attorney and expert witness fees.

## RELIEF REQUESTED

WHEREFORE, Plaintiff/Intervenors Biscayne Bay Waterkeeper and Judi Koslen respectfully request that this Honorable Court grant the following relief:

a.   Declare the County to be in violation of the Clean Water Act;

b.   Declare the County to be in violation of the First Partial and Second Partial and Final Consent Decrees in this case;

c.   Declare the new proposed Consent Decree to be unfair, unreasonable and not in the public interest, for the reasons set forth herein;

d.   Order the County to comply with the Consent Decrees filed in this case by immediately taking "all steps necessary to minimize further unpermitted discharges of untreated wastewater containing raw sewage to local surface waters";

e.   Enjoin the County from discharging any raw sewage from any sanitary sewer overflows into the surface waters of the United States, as well as into the storm-water system or on to public and private property (e.g., streets, yards, parking lots, etc.);

f.   Set firm dates for completion of all capital improvements that will assure the Court that no future SSOs or NPDES violations will occur;

g.   Enjoin the County from discharging any raw sewage from any under-bay sewage force main;

h.   Order the County to immediately take all necessary measures, using best available practices, to repair or replace all segments of its under-bay sewer force mains that County (or its contractors) have identified as being in imminent and substantial danger of collapse or otherwise in a condition of disrepair;

i.   Report on a weekly basis to the Court on the County's progress in repairing or replacing the under-bay force mains that are in imminent and substantial danger of collapse, until such repairs or replacements are completed, fully tested and operational;

j.   Order the County to provide the Court with a contingency plan to respond to any under-bay force main leak or collapse, including the appropriate personnel and equipment required to immediately close-off or cap the discharge of raw sewage into the waters of the United States so as to minimize the harm to humans and the environment to the maximum extent possible, in case of a leak from the under-bay sewer force mains;

k.   Appoint a Special Master/Inspector General to monitor the: (1) planning; (2) funding; (3) implementation; and, (4) future operation and maintenance of capital projects in the County's sewage collection and treatment system required to eliminate illegal SSOs and NPDES violations at the County's wastewater treatment plants; and required for the proper operation and maintenance of its sewage collection and transmission system, utilizing accepted best planning, management, engineering and fiscal practices. The Special Master/Inspector General shall report back to the Court, the Plaintiff/Intervenors and the public on an appropriate and regular basis.

l.   Order the County to pay for such Supplemental Environmental Projects as are approved by the Court.

m.   Order the County to operate in continuous compliance with the Act by no longer discharging raw sewage through SSOs and no longer violating its NPDES Permits;

n.   Order the County to immediately post public health warning signs at all SSO locations, as well as at those SSO locations on public and private property (e.g., streets, yards, parking lots, etc.).  The warning signs shall be of such a size and type so as to be visible to affected persons and shall remain in place until at least one year after the elimination of the SSO, to ensure that they do not start discharging again;

o.   Order the County to establish a SSO victims' compensation program under the supervision of the Court, as was established in the EPA-County Consent Decree in Cincinnati, OH (http://www.msdgc.org/consent_decree/) to reimburse

individuals, homeowners and businesses who have suffered damages from County-caused sewage overflows;

p.  Order the County to pay civil penalties as required by 33 U.S.C. §§1319(d) and 1365(a), with due consideration of EPA's Penalty Policy;

q.  Order the County to pay Plaintiff/Intervenors' reasonable attorneys' fees and expert witness fees and costs as authorized by 33 U.S.C. §1365(d), and,

r.  Grant such other equitable and legal relief as this Honorable Court deems just and proper.

**DATED**: November 13, 2012

Respectfully submitted,

By:     s/Paul J. Schwiep_____
        Paul J. Schwiep, Fla. Bar No. 823244
        COFFEY BURLINGTON, P.L.
        2699 South Bayshore Drive, Penthouse
        Miami, Florida 33133
        Phone: 305-858-2900
        Fax: 305-858-5261
        pschwiep@coffeyburlington.com

        -and-

        Julie Dick, Esq., Fla. Bar No. 86455
        Abraham Law Group
        151 Crandon Blvd., #100
        Key Biscayne, FL 33149
        Phone: 786-224-4555
        Fax:   888-335-2579
        jdick@abrahamlawgroup.com

        -and-

        James M. Porter, P.A, Fla. Bar No. 443239
        9350 S. Dixie Highway, 10th Floor
        Miami, Florida 33156
        Phone: 786-425-2299
        Jim@JamesMPorterPA.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November, 13, 2012, I electronically filed the foregoing with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record on the Service List below via transmission of Notice of Electronic Filing generated by CM/ECF.

s/Paul J. Schwiep

## <u>SERVICE LIST</u>

Rachel Kamons, Esq., Trial Attorney
Rachael.Kamons@usdoj.gov
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
601 D Street NW, Suite 6031
Washington, DC 20044
Telephone: 202-514-5260
Facsimile: 202-616-2427

Peter B. Outerbridge, Esq.
Peter.outerbridge@usdoj.gov
United States Attorney's Office
99 NE 4 Street
Miami, Florida 33132
Telephone:  305-961-9326
Facsimile:   305-530-6168

Robert A. Cuevas, Jr.
Rac1@miamidade.gov
Dade County Attorney's Office
111 NW 1 Street
Suite 2810
Miami, Florida 33128
Telephone:  305-375-3842
Facsimile:   305-375-5634

Jonathan A. Glogau, Esq.
Jon.glogau@myfloridalegal.com
Attorney General Office
Department of Legal Affairs
The Capitol PL-01
Tallahassee, Florida 32399
Telephone: 850-414-3300
Facsimile:  850-414-9650